JOSEPH TOKER COMPANY, INC., A CORPORATION OF NEW JERSEY, PLAINTIFF-APPELLANT, v. LEHIGH VALLEY RAILROAD COMPANY, A CORPORATION OF PENNSYLVANIA, DEFENDANT-RESPONDENT.

Argued June 1, 1953—Decided June 22, 1953.

Mr. *Jules E. Tepper* argued the cause for appellant (*Messrs. Tepper, Tepper & Verney*, attorneys; *Messrs. Bernard Verney* and *Ira D. Dorian* on the brief).

Mr. *Arthur J. Blake* argued the cause for respondent (*Messrs. Emory, Langan & Lamb*, attorneys; *Mr. Bart J. Viviano* of the New York Bar and *Mr. James J. Langan* on the brief).

The opinion of the court was delivered by

JACOBS, J. The plaintiff appeals, pursuant to certification granted by this court, from a judgment for the defendant entered in the Hudson County District Court and affirmed in the Appellate Division. See *Joseph Toker Co., Inc. v. Lehigh Valley R. Co.*, 23 N. J. Super. 289 (*App. Div.* 1952).

The plaintiff, a retail coal dealer of New Jersey, purchased anthracite coal from producers in Pennsylvania for delivery via the defendant railroad and its connecting carrier. The railroad received the coal, which had been washed, and it was loaded in open cars and weighed. It then issued its waybill or bill of lading which specified the net weight of the contents of the car after deduction of a percentage for "water allowance." The plaintiff paid the purchase price and the freight charges on the basis of this net weight. When the cars arrived at their destination they were re-weighed by the connecting carrier disclosing weight deficiencies in varying amounts. The plaintiff filed loss claims with the railroad which were honored in full in every instance where the deficiency exceeded 1½% of the net weight set forth in the waybill. However, where the deficiency did not exceed 1½% the claims were dishonored by the defendant on the ground that it was entitled to the benefit of a tolerance in that amount in accordance with its tariff schedule on file with the Interstate Commerce Commission. The Hudson County District Court, sitting without a jury, accepted this ground and denied the plaintiff's claim for recovery based on weight deficiency not exceeding 1½%. On appeal the Appellate Division expressly rejected

the aforestated ground but held nevertheless that the plaintiff was not entitled to recovery because it had "not carried its burden of proof sufficiently by a mere showing of a disparity in the respective weights at origin and destination." It expressed the view that the greater probability was that the differences in weight "were due to the weather conditions, variations in scales due to mechanical deficiencies, the difference in the manner of weighing at point of origin and destination and the difference in the competency of the persons who weighed at these points." Neither of the lower courts made any findings which we need, under the circumstances, consider ourselves bound to honor. *Cf. Rule* 1:2–20. The basic facts were not in dispute and our present concern is with the factual and legal inferences and conclusions which may properly be drawn on the complete record before us.

 With stated exceptions, the common carrier's liability for the loss of property entrusted to it was absolute at common law. See *Holmes, The Common Law* 180 (1951); *Beale, The Carrier's Liability: Its History,* 11 *Harv. L. Rev.* 158 (1897); 9 *Am. Jur.* 813 (1937); *Chicago & E. I. R. Co. v. Collins Produce Co.,* 249 *U. S.* 186, 192, 39 *S. Ct.* 189, 63 *L. Ed.* 552, 555 (1919). The original exceptions were confined to losses resulting from acts of God or the public enemy but they have now been expanded to certain other losses including those resulting from the inherent nature of the property or the default of the shipper. See *Commodity Credit Corp. v. Norton,* 167 *F. 2d* 161 (*C. C. A.* 3 1948); *Ledoux v. Railway Express Agency,* 113 *Vt.* 480, 35 *A. 2d* 665 (*Sup. Ct.* 1944); *Villari v. James,* 155 *Pa. Super.* 155, 38 *A. 2d* 379 (*Super. Ct.* 1944); 9 *Am. Jur.* 847 (1937); 13 *C. J. S., Carriers,* § 79, *p.* 152 (1939). *Cf. Kassel Poultry Co. v. Penna. R. R. Co.,* 7 *N. J. Misc.* 301, 304 (*Sup. Ct.* 1929). The burden of establishing strictly that the loss resulted from one of the excepted causes has always been recognized as resting on the carrier. 1 *Michie, Carriers* 820 (1915); *Galveston H. & S. A. R. Co. v. Wallace,* 223 *U. S.* 481, 492, 32 *S. Ct.* 205, 56 *L. Ed.* 516, 523 (1912). And this is clearly as it should be, for complete control and

knowledge after the shipment has begun are in the carrier rather than the shipper. See *New Brunswick Steamboat & Canal Transp. Company v. Tiers et al.*, 24 *N. J. L.* 697, 700 (*E. & A.* 1853); *Schnell v. The Steamship Vallescura*, 293 *U. S.* 296, 304, 55 *S. Ct.* 194, 79 *L. Ed.* 373, 377 (1934).

The burden of proving that a loss of its property occurred is, of course, on the shipper but it satisfies that burden by establishing delivery to the carrier, and its non-return. *Chicago & Northwestern Railway Co. v. C. C. Whitnack Produce Co.*, 258 *U. S.* 369, 371, 42 *S. Ct.* 328, 66 *L. Ed.* 665, 667 (1922); *Lehigh Valley R. Co. v. State*, 21 *F. 2d* 396, 403 (*C. C. A.* 2 1927), *cert.* denied 275 *U. S.* 571, 48 *S. Ct.* 159, 72 *L. Ed.* 432 (1927). The waybill or bill of lading itself constitutes weighty and *prima facie* evidence of the delivery to the carrier of the goods in the quantity and quality described therein. See *Sprotte v. D. L. & W. R. R. Co.*, 90 *N. J. L.* 720 (*E. & A.* 1917); *Chicago & N. W. Ry. Co. v. Bewsher*, 6 *F. 2d* 947, 954 (*C. C. A.* 8 1925); *cert.* denied 270 *U. S.* 641, 46 *S. Ct.* 205, 70 *L. Ed.* 775 (1926); *Gulf C. & S. F. Ry. Co. v. Galbraith*, 39 *S. W. 2d* 91, 93 (*Tex. Civ. App.* 1931); *New York & B. Transp. Line v. Lewis Baer & Co.*, 118 *Md.* 73, 84 *A.* 251, 256 (*Ct. App.* 1912); *Smith v. Louisville & N. R. Co.*, 202 *Iowa* 292, 209 *N. W.* 465, 466 (*Sup. Ct.* 1926). When coupled with evidence that the carrier returned goods in lesser quantity or quality than described in the waybill or bill of lading, the shipper's burden of proof has been met fully. See *National Elevator Co. v. Great Northern Ry. Co.*, 137 *Minn.* 217, 163 *N. W.* 164 (*Sup. Ct.* 1917); *Pennsylvania R. Co. v. Windfall Grain Co.*, 93 *Ind. App.* 194, 177 *N. E.* 902 (*App. Ct.* 1931); *Central of Georgia Ry. Co. v. Clark Milling Co.*, 40 *Ga. App.* 113, 149 *S. E.* 77 (*Ct. App.* 1929); *Smith v. Louisville & N. R. Co., supra; Nield v. Illinois Cent. R. Co.*, 55 *S. D.* 229, 225 *N. W.* 654 (*Sup. Ct.* 1929). The cited cases dealt with shipments of wheat, corn and coal, and in each instance the shipper established that the weight at destination was less than the weight at point of origin; in the absence of satisfactory proof by the carrier that the loss

indicated by the weight discrepancies was due to an excepted cause recovery by the shipper was allowed. However, in *Nye-Schneider-Fowler Co. v. Chicago & N. W. Ry. Co.*, 106 *Neb.* 149, 182 *N. W.* 967 (*Sup. Ct.* 1921), the court denied recovery despite evidence that the weight of the grain shipped was less at destination than at origin; in reaching its result the court noted that the weights relied upon were those shown on the shipper's rather than the carrier's scales, that the grain was shipped in closed cars which arrived with seals unbroken and without evidence of leakage, and that the shipper's own evidence disclosed the substantial capacity of grain for shrinkage from loss of moisture. *Cf. Davis v. Zimmern*, 211 *Ala.* 63, 99 *So.* 307 (*Sup. Ct.* 1924).

In the instant matter the coal was transported by the carrier in open cars and some of it may well have been lost in transit because of improper loading or pilferage en route. In this event the responsibility is clearly the carrier's, but the record before us is barren of any affirmative evidence negating this possibility. Similarly, there is no legal evidence disputing the accuracy of the weights taken and recorded by the carriers at origin and destination, although the contention is advanced that the weight deficiencies may possibly have been due to weighing inaccuracies resulting from differences in scales, atmospheric conditions and methods of weighing at origin and destination. But this is wholly speculative and is not supported by evidence that in the particular case before us there were any such actualities resulting in variations. In *Smith v. Louisville & N. R. Co.*, *supra*, the court rejected a similar contention by a railroad carrier, saying:

"It contends further that it is not practicable to obtain exact weights of cars of coal because of a normal variation as between different scales. It calls this variation a 'scale tolerance,' and contends that this 'tolerance' or difference runs from 500 to 1,000 pounds as between different scales in the weighing of a carload. It contends, therefore, that this 'scale tolerance' should have been considered by the court, and that the shortage in each case should have been deemed accounted for by such 'tolerance' to the extent of at least 1 per cent. of the weight of the carload. Taking up

the second point first, no reason is suggested by the appellant why the 'scale tolerance' should be deemed as uniformly working a shortage. Assuming such 'scale tolerance' to be a normal condition or result, and beyond the control of the human will, then the law of probabilities would tend to distribute it equally on each side of the correct line. To assume that it would work only on the 'short' side would be to attribute to it the human frailty of partiality. The respective weights were made both at the shipping and at the delivering end by the carriers, and must be deemed as presumptively correct.".

The public policy which supports the imposition of a high degree of responsibility on common carriers has ancient origins and though conditions have changed its force has not lessened. Once the carrier takes control the obligation of establishing nonliability for loss rests upon it firmly. And where, as here, the shipper accepts the carrier's weight at point of origin as set forth in its waybill, pays the purchase price and freight charges on the basis thereof, and thereafter receives coal, admittedly lesser in weight according to the scales of the carrier's agent, it ought in all fairness have the right to call upon the carrier to establish by affirmative evidence rather than mere speculation, that the apparent loss of coal was not actually any loss at all but a miscalculation. Notwithstanding control of the scales by the carrier or its agents, no substantial attempt was made by it to demonstrate that they were in fact inaccurate or, indeed, that the factors which might impair their accuracy were in fact present.

In addition to its contention that the apparent loss might have been attributable to scale inaccuracies, the carrier urges that it might perhaps have resulted from weather conditions and moisture evaporation; here again its position rests upon conjecture rather than legal evidence. Thus, it did not introduce evidence as to the prevailing weather conditions nor did it introduce any analysis or other proof indicating that the particular coal transported actually lost moisture during transit. The fair inferences to be drawn from the testimony suggest the contrary. Thus, the carrier deducted a "water allowance" before recording the net weight at the point of origin. While this allowance was intended to provide

for evaporation after the washing of the coal, the record in nowise establishes that there was any additional shrinkage beyond the amount deducted as water allowance. Indeed, at one point the carrier's own expert stated that he doubted whether the anthracite coal shipped would "take on weight" or "lose weight" in the course of shipment, presumably after completion of the evaporation ensuant to the washing.

■ The carrier urges that in any event it was entitled to judgment since the plaintiff's loss was within the tolerance of 1½% set forth in its tariff schedule on file with the Interstate Commerce Commission. The Appellate Division expressly rejected this contention and we think rightly. See 23 *N. J. Super.*, at *p.* 293. The tolerance related solely to freight charges within the jurisdiction and control of the Interstate Commerce Commission and had no relation to loss claims beyond the jurisdiction and control of the Commission. It is not disputed that the Commission has no authority and does not purport to exercise authority over civil claim for the recovery of the value of property lost in transit. See *Gustafson v. Michigan Central R. R. Co.*, 296 *Ill.* 41, 129 *N. E.* 516 (*Sup. Ct.* 1920), *cert.* denied 256 *U. S.* 698, 41 *S. Ct.* 538, 65 *L. Ed.* 1177 (1921). The shipper's right to assert such claim against the initial carrier where, as here, there has been an interstate shipment is expressly provided for in the Carmack Amendment (49 *U. S. C. A.*, § 20(11)) which provides not only that the initial carrier shall be liable but also that, apart from exceptions not material here, there shall be no limitation of liability for the full actual loss. Neither the carrier nor the Commission could lawfully provide that liability to the shipper for loss of coal in transit shall not accrue until the loss exceeds 1½% of the coal shipped.

■ We are satisfied that upon the record before us the plaintiff established a *prima facie* case of actual loss of coal; that the defendant did not produce sufficient evidence to nullify the plaintiff's showing of loss and did not carry the burden of establishing that the loss resulted from a cause for which it was not accountable; that the defense based on the tolerance filed with the Interstate Commerce Commission

was legally insufficient; and that plaintiff was entitled to the entry of judgment in the amount claimed. Accordingly, the action of the lower courts is

Reversed, with direction that judgment for plaintiff be entered in the district court.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For affirmance*—None.